

**E-FILED**
**CNMI SUPREME COURT**
E-filed: Jul 28 2026 04:26PM
Clerk Review: Jul 28 2026 04:27PM
Filing ID: 80141143
Case No.: 2024-SCC-0008-CIV
Judy Aldan



IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

IN RE THE ESTATE OF
ANUNCIACION MENDIOLA CAMACHO MAGOFNA,
*Deceased.*

**Supreme Court No. 2024-SCC-0008-CIV**

---

**SLIP OPINION**

**Cite as: 2026 MP 7**

Decided July 28, 2026

————————

JUSTICE PRO TEMPORE ROBERT J. TORRES, JR.
JUSTICE PRO TEMPORE KATHERINE A. MARAMAN
JUSTICE PRO TEMPORE LILLIAN A. TENORIO

————————

Superior Court Civil Action No. 19-0210
Associate Judge Kenneth L. Govendo, Presiding

————————

PER CURIAM:

¶ 1     This case arises from a dispute over whether two individuals, Annette P. Cruz ("Annette") and Dolores Sablan Mendiola-Aldan ("Dolores"), can inherit from the estate of Anunciacion Mendiola Camacho Magofna ("Asako") who died intestate. They claim to have been adopted by Asako through the Chamorro customary practice of poksai. The probate court found that both Dolores and Annette were customarily adopted and heirs to the estate. Froilan Camacho Jr., the administrator of the estate of Asako ("Estate") appeals these determinations and other findings of fact made in the heirship determination.

## I. FACTS AND PROCEDURAL HISTORY
### *A. Dolores' Childhood and Relationship with Asako*

¶ 2     Dolores was born on June 4th, 1958, to Juan Sablan Mendiola ("Juan") and Veronica Taramao Tolay. Juan was a carpenter on a ship and often away at sea. He allowed Dolores to be statutorily adopted and raised by his parents, Joaquin M. Mendiola and Dolores S. Mendiola ("the Mendiolas"). Asako was Juan's sister and, along with her husband Froilan Tudela Camacho ("Froilan"), lived with the Mendiolas after Dolores was statutorily adopted. Despite having Dolores adopted by his parents, decades later, Juan listed her as one of his children in his will and appointed her executor of his estate.

¶ 3     Dolores stayed with the Mendiolas until she was four years old. After a stillbirth, Asako moved out of the house to Tanapag. At this time, the Mendiolas allowed Asako and her husband to raise Dolores. The Mendiolas remained her statutorily adopted parents. Upon Joaquin M. Mendiola's death, Dolores inherited from his estate as one of his legal heirs.

¶ 4     Asako treated and addressed Dolores as her daughter and did not mention that Dolores was customarily adopted through poksai to other people, even close friends. Asako drove and picked up Dolores every day to and from elementary school. After elementary school, Dolores took the bus.

¶ 5     Dolores helped Asako take care of Asako's biological children and treated them as her brothers and sisters. While in high school, Dolores gave Asako some of her income to support the family. Dolores' boyfriends went to Asako and Froilan for permission to marry Dolores as if Asako was her parent.

¶ 6     The family records never listed Dolores as one of Asako's children. Dolores testified that several pieces of evidence supporting her relationship with Asako have been destroyed or are missing, such as family albums and a braided lock of Dolores' hair.

¶ 7     While going to school, Dolores would spend one night a week at the home of Asako's sister, Estefania Mendiola ("Estefania"), in Chalan Kanoa. She kept all her belongings in her room in Tanapag with Asako. Dolores referred to Asako as "mother," Estefania "Nan Nia," and the Mendiolas as "Nana and Tata."

¶ 8     Estefania had adopted Dolores' son Patrick through poksai. While some people knew Patrick was Dolores' biological son, they agreed that Estefania

raised him. Patrick developed a gambling addiction and lost a large amount of Estefania's money after gaining power of attorney over her. He mortgaged her house and nearly lost it. Estefania told Dolores what Patrick had done and asked her to take care of her estate.

¶ 9     Dolores listed herself as pineksai, the term for a child adopted through poksai, in the final distribution of Estefania's estate based on Asako sending Dolores to Estefania's house once a week. Dolores claims the purpose of listing herself as a child of Estefania was to allow her to inherit the debt to pay off the loan on the house. Dolores also listed herself as a pineksai of Estefania's husband.

### 2. Annette's Childhood and Relationship with Asako

¶ 10     Annette Palacios Cruz, originally named Pamela Ulloa Palacios, was born on October 10, 1972, to Esperanza Ulloa Palacios and Augustin Palacios Tudela. Asako and Froilan were Annette's aunt and uncle at birth.

¶ 11     Asako asked Annette's parents if Asako and Froilan could legally adopt Annette. On November 7, 1972, Froilan and Asako filed a petition to adopt Annette with the consent of Annette's biological parents and to change her name from Pamela Ulloa Palacios to Annette Mendiola Camacho. On the same day, Annette's biological parents filed their Consent to Adoption.

¶ 12     Annette was raised by Froilan and Asako in their home. She grew up with their biological children. No one in the family told Annette of her adoption, and she believed her biological parents to be her aunt and uncle. Her biological parents visited Asako's house occasionally, but Annette did not visit them.

¶ 13     When Annette was attending Hopwood Junior High School, another student told her that she was adopted and had siblings who attended the school. When Asako discovered Annette had learned this, Asako was upset and went to the school office to complain and find out who disclosed the adoption.

¶ 14     When she attended Marianas High School, Annette and her biological brother, Augustin Palacios, were one year apart. When Annette was 17 years old, Augustin Palacios told Annette to "pack her stuff because they were going to Utah." Annette agreed and left for Utah without Asako's permission.

¶ 15     During Annette's time in Utah, she stayed with her biological siblings Augustin, Joaquin, and Neticia Palacios as well as Joaquin's wife and children. Joaquin Palacios gave Annette a document and told her she needed to sign it because Asako did not want to be responsible for Annette if something happened to her while she was in Utah and no longer under Asako's care. Annette claims she believed that the document only released Asako from responsibility for her while she lived in Utah and did nothing more. The document was a Consent to Adoption. After Annette signed it, the Superior Court of the CNMI issued the Decree of Adoption of Annette to her biological parents on April 16, 1990, and changed her name to back to Pamela Ulloa Palacios.

¶ 16     Annette remained in Utah for a year and then returned to Saipan. She did not speak to Asako during this time.

¶ 17    One month after returning to Saipan, Annette went back to Asako's house and reconciled. Asako continued to behave like a mother to Annette, visiting Annette in the hospital and meeting her and her children once a month. Annette's children referred to Asako as Grandma, and Asako named Annette's last child.

¶ 18    Asako asked Annette to change her name back to Annette. Annette followed her request and received a court order to change her name. Annette was included in Asako's family record books and photographs along with the other children.

### 3. Asako's Intentions for Her Estate

¶ 19    Asako stated that her children would "find out when [she] died" how the property would be determined. The probate court found that there was not a will, a "formal partida," or a testamento from Asako. The court found no evidence of Asako indicating how she would distribute her assets before her death.

¶ 20    The probate court noted that Froilan, Asako's first husband, did not leave anything to Dolores or Annette, instead leaving property only to his biological children and Asako. However, the probate court did not find this indicative of Asako's intentions. Froilan was lost at sea in approximately 1982 and so his intentions would not be probative to Asako, who died in 2019.

## II. JURISDICTION

¶ 21    We have appellate jurisdiction over final judgments and orders of the Commonwealth Superior Court. NMI CONST. art. IV, § 3.

## III. ISSUES ON APPEAL AND STANDARD OF REVIEW

¶ 22    There are three issues on appeal. The first is what effect the statutory adoptions of Dolores and Annette had on their claims to customary adoption by Asako. The estate describes the statutory adoptions as departures from customary practice. The standard of review for the decision to apply customary law when it is alleged that the parties departed from custom is de novo. *In re Estate of Rangamar*, 4 NMI 72, 74 (1993). The estate also raises this issue as a matter of the proper interpretation of the relevant statutes and the custom of poksai. Interpretations of statutory and customary law are reviewed de novo. *In re Estate of Kapileo*, 2026 MP 2 ¶ 12; *In re Estate of Seman*, 4 NMI 129, 130 (1994).

¶ 23    The second issue is whether Dolores' prior inheritance as a pineksai of Asako's sister, Estefania, prevents her from inheriting as a pineksai from Asako. As a matter of customary law, this is reviewed de novo. *In re Estate of Seman*, 4 NMI at 130.

¶ 24    The third issue is whether the trial court erred by making factual findings that neither a partida nor testamento was performed. Allegations of incorrect factual determinations are reviewed under the clear error standard. *In re Estate of Rios*, 2008 MP 5 ¶ 22.

## IV. DISCUSSION

### A. Statutory Adoption and Poksai

¶ 25    Before deciding what effect the statutory adoptions of Dolores and Annette had on their claims to customary adoption by Asako, it will be helpful to first examine what is required to inherit as a pineksai, a child customarily adopted through poksai, and to review the relevant statutory adoption law. We can then determine whether statutory adoption laws create a barrier to a customary adoption or whether a departure from custom has occurred.

### 1. Poksai

¶ 26    Poksai is Chamorro customary adoption. Poksai has been defined by the Supreme Court as "the raising of a child as though the child were a natural and legitimate child." *In re Estate of Macaranas*, 2003 MP 11 ¶ 13 (quoting *In re Estate of Cabrera*, 2 NMI 195, 198 n.1 (1991)). The term for a child adopted through poksai is pineksai. *Id.* ¶ 4 n.4. Pineksai raised as natural and legitimate children inherit during intestate proceedings as if they were the natural children of their adopted parents. *Id.* ¶ 17; 8 CMC § 2918(a). Upon finding a pineksai was raised as a natural and legitimate child, the trial court cannot further inquire into whether the pineksai can inherit. *Macaranas*, 2003 MP 11 ¶ 17.

¶ 27    We have yet to lay out a clear factor test for poksai adoptions. *Cf. In re The Estate of Olopai*, 2015 MP 3 ¶ 15 (listing eight factors to determine if Carolinian custom of mwei-mwei adoption has occurred). The trial court here employed a non-exhaustive factor test: 1) that the poksai occur when the claimant was young, 2) the decedent treated the claimant as their child both within and outside the family, 3) claimant treated decedent as their legitimate parent, 4) claimant was not aware that they were adopted until later in their life, 5) claimant's biological parents were not involved in claimant's life, and 6) the community and family were aware claimant was a child of the decedent.

¶ 28    Because these factors align with our precedent on poksai, we adopt them as a non-exhaustive list of factors when determining whether a poksai adoption occurred. The first element, the age at the time of adoption, aligns with the requirement that the pineksai be a "child." It aligns with our precedent that a finding that the pineksai was adopted "as a little girl" was "helpful." *Macaranas*, 2003 MP 11 ¶ 13 (quoting *In re Estate of Cabrera*, 2 NMI 195, 199 (1991)). The second and third factors relate to the parental relationship and help logically establish any claim of adoption. *See id.* (stating a finding relating to the raising of the pineksai is "important language").

¶ 29    The fourth, fifth, and sixth elements connect to being treated as a "natural and legitimate" child. *See id.* ¶ 17 (emphasizing importance that inheriting pineksai was treated as natural and legitimate). The child would be treated differently from a natural and legitimate child if they were told that they were not the child of their parents, if a separate group of parents was heavily involved in their raising, or if their parents did not hold them out as their child.

¶ 30    We add to this non-exhaustive list of factors a seventh element to examine: the child's relationship with other potential parents. Here, previously holding oneself out as the pineksai of someone else is one factor that points against finding a poksai relationship. We adopt this expanded factor test but emphasize all the circumstances must be considered when determining whether poksai adoption has occurred. We now review the statutory adoption law and any restrictions on customary adoptions.

### 2. Statutory Adoption Law Did Not Create Restrictions on Customary Adoptions

¶ 31    The statutory adoption law at the time of both Dolores and Annette's adoptions was the Trust Territory Domestic Relations Code. *See* 39 TTC §§ 2, 251–55 (providing a mechanism for statutory adoptions).[1] The interaction between the Trust Territory Domestic Relations Code and customary law is described in 39 TTC §§ 4, 5. No "restrictions or limitations [were] . . . imposed upon the granting of . . . adoptions [made] in accordance with local custom." 39 TTC § 4.

¶ 32    The code created a mechanism to allow the confirmation of challenged customary adoptions when "the validity thereof is questioned or disputed by anyone in such a manner as to cause serious embarrassment to or affect the property rights of any of the parties or their children." 39 TTC § 5. When a customary adoption was confirmed under this provision, it was acknowledging a legal fact that had occurred. *See In re Iyar*, 2 TTR 329, 331–32 (Trial Div. 1962) (finding a child was legally adopted when customary adoption occurred).

¶ 33    The Estate argues the existence of this mechanism means the drafters of the code intended statutory and customary adoption to be separate and distinct. The Estate further argues reading the statute as permitting customary adoptions that overlap with statutory adoptions is forcing custom on those who have chosen to depart from it. However, the Trust Territory Code is explicit it should not be read to create barriers for customary adoptions. *See* 39 TTC § 4. The mechanism for recognition was not meant to be a general or exclusive avenue for customary adoption under the code but served as a necessary, limited exception to the Trust Territory Congress's general reluctance to intervene in custom. *See* 39 TTC § 4. The trial court was correct to find no barrier to customary adoptions in the text of the statutory adoption code. Finding that a statutory adoption creates a barrier to future customary adoptions would contradict the code's explicit disavowal of any limit or restraint on the application of customary law.

¶ 34    This interpretation is supported by the fact that there is no "one-set of parents" rule under the Trust Territory Code. *Cf. In re Estate of Heater v. Carlon*, 498 P.3d 883, 893 (Utah 2021) (discussing how Utah's probate code's "one-set of parents" rule for adoptees conflicted with "dual succession" under common law doctrine of equitable adoption). Instead, the Trust Territory Code expressly

---

[1]    We note that the adoption code has subsequently been revised substantially with P.L. 8-42, which came into effect January 21, 1994.

defaulted to permitting inheritance from the natural and statutory adoptive parents. 39 TTC § 255. This Court surveyed the Trust Territory code and the common law and saw no barrier to permitting Carolinian customary adoptees from similarly inheriting from both the natural and customarily adoptive parents. *In re Estate of Kaipat*, 2010 MP 17 ¶ 23. While not directly relevant as that case was about inheritance rather than adoption, it shows the Trust Territory Code permitted a child to have a legal relationship with more than one set of parents. As a matter of statutory interpretation, there is also no barrier for pineksai to be adopted separately by statutorily adopted parents and customarily adopted parents. We now examine whether a statutory adoption is a departure from the customary adoption of poksai.

### 3. Whether Statutory Adoption is a Departure From Customary Law

¶ 35    The Court will not apply customary law where the parties have departed from custom. *In re Estate of Igitol*, 3 CR 906, 911–12 (Trial Ct. 1989); *Rangamar*, 4 NMI 72, 77 (1993); *In re Estate of Lairopi*, 2002 MP 10 ¶ 16; *Kaipat*, 2010 MP 17 ¶ 8 n.5. A party departs from tradition when their actions are incompatible with custom. *Compare Igitol*, 3 CR at 911–12 (finding a mortgage is incompatible with customary Carolinian collective land ownership because it risked division of the land) *with Lairopi*, 2002 MP 10 ¶¶ 16 –20 (finding that an heir's sole use of the land was not incompatible with customary Carolinian land ownership because it did not amount to ownership or risk division of the land). To suddenly apply customary law in a situation where it has been abandoned is "unfair, unjust, and inequitable." *Igitol*, 3 CR at 912. That concern is especially relevant when a person has necessarily not clearly communicated their intentions, as in heirship determinations. We first turn to whether a parent who statutorily adopts has departed from the custom of poksai.

### i. Statutory Adoption Departs from Custom

¶ 36    A customary adoption tradition that preceded a formal legal system reliant on courts and statutes could not have included statutory adoption. *See* ALEXANDER SPOEHR, SAIPAN: THE ETHNOLOGY OF A WAR-DEVASTATED ISLAND 286 (1954) (finding "there are at present no legal formalities attending adoption"). This one point of divergence does not fully answer whether the two systems are incompatible. Comparing the poksai factors and the statutory scheme, many important differences emerge.

¶ 37    Statutory adoptions could only be granted by a court with proper jurisdiction, while customary Chamorro law did not use courts. 39 TTC § 251. Statutory adoption of a child over twelve required the child's consent. 39 TTC § 254. Meanwhile, a pineksai may not know about the adoption in part because it happened at an early age. *See Macaranas*, 2003 MP 11 ¶ 13 (quoting *Cabrera*, 2 NMI at 199) (highlighting importance of language indicating pineksai was a "little girl"). Additionally, the biological parent's non-involvement in the adoptee's life helps establish the poksai, while in the statutory regime it is the act of adoption itself which "relieved all parental duties and responsibilities from the natural parent," regardless of subsequent involvement. 39 TTC § 255.

¶ 38    Annette was statutorily adopted by Asako. Her statutory adoption ended with her consent when she was seventeen. She could not become customarily adopted upon her reconciliation with Asako as she was an adult and no longer a child. *See Macaranas*, 2003 MP 11 ¶ 13 (defining poksai as the raising of a child). Enforcing customary law after the decedent's death, when Asako chose to depart from custom and avail herself of the statutory adoption laws, would be unjust. *See Igitol*, 3 CR at 912. As such, Annette is not a customary heir of Asako and the trial court's determination she was pineksai was in error.

### ii. Poksai Adoption of a Child Who Had Been Previously Statutorily Adopted by Another is not a Departure from Custom

¶ 39    The next situation to address is Dolores having been statutorily adopted by one set of parents before being customarily adopted by another set of parents as a pineksai. We are not examining Dolores' relationship with her statutorily adopted parents, the Mendiolas, or their intent. We are solely examining Asako's relationship and intent with Dolores. The pre-existing statutory adoption has little relevance to the factors that determine whether a poksai relationship has formed between Asako and Dolores and thus is not incompatible with custom. This is demonstrated by applying the factors to Dolores.

¶ 40    Dolores was first taken in by Asako at age four, satisfying the first requirement the adoption occur when the claimant is young. For the second factor, during her childhood, Dolores lived with and was raised by Asako (except for the one night a week spent with Estefania) and the trial court found that she treated her as her own daughter. For the third factor, Dolores referred to Asako as her mother. For the fourth factor, Asako did not mention to anyone, even close friends, that Dolores was adopted. Fifth, Dolores' biological father had given her up to his parents to raise her years before Asako even took her in. Analogizing from the biological parent to the statutorily adopted parents, this factor would also be met as the Mendiolas did not raise Dolores. She spent the majority of her time with Asako and a minority with Estefania. Sixth, Asako maintained Dolores was her daughter and Dolores' boyfriends asked her for permission to marry Dolores. While Dolores' poksai relationship with Estefania cuts against Dolores being customarily adopted by Asako, on balance, the factors favor recognizing an adopted relationship.

¶ 41    A previous statutory adoption mattered under these factors only in that it helped establish the fifth element, that the claimant's biological parents were not involved in the claimant's life. As such, Asako did not depart from customary practices by customarily adopting Dolores after she had been statutorily adopted by the Mendiolas. There is not a departure from custom in recognizing the statutory adoption or is not a barrier to applying the normal poksai factors. This does not fully resolve the question of Dolores' heirship as we must examine what impact Dolores' poksai relationship with Asako's sister, Estefania, has on her poksai relationship with Asako.

### B. Multiple Poksai Adoptions for One Pineksai

¶ 42    The trial court found that Dolores was raised as a natural and legitimate child of Asako, but she had also previously inherited as a pineksai from Asako's sister, Estefania. The Estate asserts that the trial court disregarded the possibility of "different types of poksai." *See Macaranas*, 2003 MP 11 ¶ 16; *Rios*, 2008 MP 5 ¶ 22 n.9. However, this Court has stated the existence of other kinds of poksai has "no bearing" on cases which involve only pineksai raised as natural and legitimate children. *Macaranas*, 2003 MP 11 ¶ 16. A pineksai who is raised as a natural and legitimate child must inherit as if they were a legitimate child. *See Macaranas*, 2003 MP 11 ¶ 17. No further analysis is required or permitted. *Id.* The issue of Dolores' proper relationship with Estefania is not before us. We consider this question only to the extent her prior claim of customary adoption by Estefania invalidates her current claim to be a pineksai raised as a natural and legitimate child of Asako. This is a question of customary law which we review de novo. *In re Estate of Seman*, 4 NMI 129, 130 (1994).

¶ 43    The trial court heard expert testimony describing a kind of poksai between sisters where they co-raise the child. Given this testimony and that our prior acknowledgement that there are "different types of poksai," Dolores could have understood herself to be both Estefania and Asako's daughter while having been primarily raised by Asako. This prior claim of being Estefania's pineksai is therefore not incompatible with Asako raising Dolores as a natural and legitimate child.

¶ 44    This was Dolores' understanding based on the record before us. Dolores referred to Estefania as "Nan Nia," or aunt. This indicates she did not think of Estefania as being her mother. As Asako was Estefania's sister, calling Estefania an aunt is more evidence pointing to Dolores believing Asako have raised her as her natural and legitimate child. Additionally, the limited time spent with Estefania, one day a week for a portion of her childhood, does not compare with the majority of Dolores' childhood being spent in Asako's house.

¶ 45    The trial court was tasked with determining whether Dolores was raised as Asako's natural and legitimate child and found she was. She was thus entitled to inherit without any further investigation of custom. *Macaranas*, 2003 MP 11 ¶ 17. The probate court's application of customary and statutory law with regards to Dolores being an heir to the estate was not in error.[2]

---

[2]    While we review the probate court's understanding of customary law and whether there was a departure, the trial court's application of that law to determine whether there was a customary adoption is a question of fact reversed only for clear error. *Rios*, 2008 MP 5 ¶ 22 n.9. As discussed in the section regarding departure, the trial court's determination with regards to Dolores was based on substantial evidence. *See id.* (declining to overturn a finding of fact if the trial court's decision is supported by substantial evidence).

### C. Fact Findings Were Not Erroneous

¶ 46    The trial court found that there was not a partida, testamento, or will and that the estate must be probated. A partida is "the distribution of family land holdings under Chamorro custom . . . [which generally] occurs when the father calls the entire family together and outlines the division of the property among his children." *In re Estate of Pangelinan*, 2018 MP 10 ¶ 16 (quoting *In re Estate of Castro*, 4 NMI 102, 107 (1994)). A testamento is a written partida. *In re Estate of Castro*, 4 NMI 102, 110 (1994). The Estate objects to these findings on three grounds: (1) that the findings were out of scope of the proceedings, (2) that the partida could be informal, and (3) that the findings contradict the record. We review factual determinations under the clear error standard. *Rios*, 2008 MP 5 ¶ 22.

¶ 47    The Estate objects to this discussion as out of the scope of limited heirship proceedings. If there had been a will, partida, or testamento, the proceeding would not have been intestate at all. *See In re Estate of Barcinas*, 4 NMI 149, 153 n.5 (1994) (clarifying difference in procedure between a probate of a partida or testamento where the "wishes and intent of a decedent control" and an intestate proceeding where the intent is by definition unknowable). Further, a partida effectuates the transfer "from one generation to the next" where a father gives to his "children." *Pangelinan*, 2018 MP 10 ¶ 21. The inclusion or exclusion of Annette or Dolores would have been relevant to determining whether Asako considered them to be her "children." The trial court did not err in mentioning their absence.

¶ 48    The Estate also faults the discussion around whether there was a "formal partida" as a partida may also be informal. We have stated that before looking for an informal partida, the probate court must first look for a formal partida. *Seman*, 4 NMI 129, 132. This discussion was proper and not indicative of the probate court failing to understand that the partida could be informal.

¶ 49    The Estate argues in the alternate that some of the family records indicated an intent to demonstrate her heirs. They point to family records where she listed her children and did not include Dolores and Annette. However, the trial court noted those records and found them to not overcome Dolores' testimony and to potentially have reliability issues due to alleged tampering (although the trial court declined to determine whether they had been tampered with). These sorts of factual determinations relating to the credibility of evidence when supported by the record cannot be the clear error required to overturn a factual determination of heirship. *See Rios*, 2008 MP 5 ¶ 22 (upholding finding of customary adoption because "we cannot say that the trial court clearly erred"); *Pangelinan v. Pangelinan*, 2024 MP 5 ¶ 58 (stating a "clear and definite conviction that a mistake has been made" is required for a finding of clear error).

¶ 50    The findings that there was no will, partida, or testamento were made while determining whether Dolores and Annette were heirs and does not foreclose the estate from developing whether a partida, testamento or especially

a will existed if they have additional evidence that will persuade the court below, assuming there are no other procedural or evidentiary problems.

**V. CONCLUSION**

¶ 51    For these reasons, the trial court's ruling that Dolores Sablan Mendiola-Aldan is an heir of Anunciacion Mendiola Camacho Magofna and the disputed fact findings are AFFIRMED and the trial court's ruling that Annette P. Cruz is an heir of Anunciacion Mendiola Camacho Magofna is REVERSED. This matter is REMANDED for further proceedings consistent with this opinion.


      SO ORDERED this 28th day of July, 2026.


      /s/
ROBERT J. TORRES, JR.
Justice Pro Tempore


      /s/
KATHERINE A. MARAMAN
Justice Pro Tempore


      /s/
LILLIAN A. TENORIO
Justice Pro Tempore


COUNSEL

Colin M. Thompson, Saipan, MP; for Appellant.

Michael W. Dotts, Saipan, MP, for Appellee Dolores Sablan Mendiola-Aldan.

Robert T. Torres, Saipan, MP, & Charity R. Hodson, Saipan, MP for Appellee Annette Palacios Cruz.


*NOTICE*

*This slip opinion has not been certified by the Clerk of the Supreme Court for publication in the permanent law reports. Until certified, it is subject to revision or withdrawal. In the event of any discrepancies between this slip opinion and the opinion certified for publication, the certified opinion controls. Readers are requested to bring errors to the attention of the Clerk of the Supreme Court, P.O. Box 502165 Saipan, MP 96950, phone (670) 236–9715, e-mail Supreme.Court@NMIJudiciary.gov.*

**E-FILED**
**CNMI SUPREME COURT**
E-filed: Jul 28 2026 04:26PM
Clerk Review: Jul 28 2026 04:27PM
Filing ID: 80141143
Case No.: 2024-SCC-0008-CIV
Judy Aldan



IN THE

# Supreme Court

OF THE

# Commonwealth of the Northern Mariana Islands

---

**IN RE THE ESTATE OF**
**ANUNCIACION MENDIOLA CAMACHO MAGOFNA,**
*Deceased.*

---

**Supreme Court No. 2024-SCC-0008-CIV**
Superior Court Civil Action No. 19-0210

**JUDGMENT**

Appellant Estate of Anunciacion Mendiola Camacho-Magofna appealed the trial court's order finding Claimants, Dolores Sablan Mendiola-Aldan and Annette P. Cruz, heirs of Anunciacion Mendiola Camacho Magofna through the customary adoption practice of poksai. For the reasons set forth in the accompanying opinion, the Court REVERSES in part and AFFIRMS in part.

ENTERED this 28th day of July, 2026.


 /s/
———————————————————
JUDY T. ALDAN
Clerk of the Supreme Court